## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                   No. CR 10-3239 JB

CHRISTIAN ALEXANDER SANGIOVANNI,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Mr. Sangiovanni's Sentencing Memorandum, filed August 14, 2013 (Doc. 85)("Sangiovanni Memo."); and (ii) the United States' Sentencing Memorandum, filed December 12, 2013 (Doc. 97)("U.S. Memo."). The Court held sentencing hearings on October 18, 2013, and December 16, 2013. The primary issues are: (i) whether the Court should apply the kidnapping guideline, see U.S.S.G. § 2A4.1, where Defendant Christian A. Sangiovanni was tried and convicted only of being a felon in possession of a firearm, see 18 U.S.C. § 922(g)(1), but some evidence suggests that Sangiovanni's conduct also meets the definition of kidnapping under New Mexico law, see N.M. Stat. Ann. § 30-4-1; and (ii) whether the Court should vary downward from the Guidelines-calculated sentence -- which is the statutory maximum sentence -- in sentencing Sangiovanni. The Court answers both questions in the negative. Although the Court could apply the kidnapping guideline pursuant to the cross-reference provision of the felon-in-possession guideline without running afoul of the Sixth Amendment to the Constitution of the United States of America, it finds that Sangiovanni's conduct does not satisfy the elements of kidnapping under either New Mexico or federal law. Even without the cross reference, however,

Sangiovanni's "true" Guidelines sentencing range[1] -- which is 169-210 months before U.S.S.G. § 5G1.1 directs the Court to reduce it to match the statutory maximum -- is significantly higher than the statutory maximum for being a felon in possession of a firearm, which is 120 months. Thus, even a one-month downward variance from 120 months to 119 months is tantamount to a 49-month downward variance, and the Court is disinclined to grant such a large variance. The Court will therefore sentence Sangiovanni to the statutory maximum of ten-years imprisonment.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed July 11, 2013 ("PSR"), that the United States Probation Office ("USPO") prepared. The USPO gets its facts through independent investigation and from the Plaintiff United States of America's discovery materials. See PSR ¶ 5, at 4.

### 1.    Sangiovanni's Personal Characteristics.

Sangiovanni is a man in his early-thirties with an extensive criminal history and a "florid mental health history." Sangiovanni Memo. ¶ 16, at 9. In 2002, when Sangiovanni was nineteen years old, he was arrested for sexual exploitation of children after social workers discovered a series of pictures of Sangiovanni performing sex acts with a fourteen-year-old ward of the state named Irene Walker and her seventeen-year-old companion. See PSR ¶ 46, at 11. The victim in that case had given birth to Sangiovanni's child a year earlier, and there were already allegations

---

[1]The Guidelines Manual contains a provision directing the sentencing court, after performing all applicable Guidelines calculations, to throw out the resulting sentencing range in favor of: (i) the statutory maximum, if the bottom of the range is higher than the statutory maximum; or (ii) the statutory minimum, if the top of the range is lower than the statutory minimum. See U.S.S.G. § 5G1.1(a)-(b). A 120-month sentence is therefore not considered to be a variance, because the Guidelines direct it. A sentence of 119 months, however -- while technically a one-month variance -- is really more akin to a 49-month variance, because the "true" Guidelines range -- the one calculated based on Sangiovanni's relevant conduct, not the one imposed on the Guidelines by the statute -- is 168-210 months. See infra note 9, at 32.

that Sangiovanni would torture Walker by burning her with cigarettes and holding her hostage with a knife.  See PSR ¶ 54, at 14.  While that case was pending, Sangiovanni picked up another arrest for embezzlement and false reporting for stealing $311.55 from a fast-food restaurant.  See PSR ¶ 48, at 12.  He was ultimately convicted of all charges and was sentenced to nine-years imprisonment in the New Mexico state system, of which he ultimately served a little over five years.  See PSR ¶¶ 46-47, at 11-12.  While in jail awaiting disposition of those charges, he was arrested and later convicted of battery upon a peace officer -- an Otero County Detention Officer -- and classified as a habitual offender, for which he received a two-and-a-half year sentence to run consecutive to his sex offense.  See PSR ¶ 48, 12-13.  In prison, Sangiovanni was arrested and convicted of attempt to traffic a controlled substance, i.e., possession with intent to distribute heroin, and sentenced to two-years imprisonment.  See PSR ¶ 49, at 13.  Sangiovanni was paroled in 2009, at which point he proceeded to earn convictions for failure to register as a sex offender and for the offense now before the Court.  See PSR ¶ 50, at 13.

Mentally, Sangiovanni is, by all accounts, not well.  He says he suffers from depression, bi-polar disorder, and post-traumatic stress disorder, a list that clinical psychologist Dr. Elliot J. Rapoport confirms, and to which Dr. Rapoport adds diagnoses for polysubstance dependence, personality disorder, and untreated hepatitis C.  See PSR 74, at 18; id. ¶ 79, at 19.  Sangiovanni never had significant contact with his father and had only "periodic contact" with his mother before her death in 2000 or 2001.  See PSR ¶ 63, at 16.  The New Mexico Children, Youth, and Families Department ("CYFD") took custody of Sangiovanni and at least one of his older brothers when Sangiovanni was ten years old.  See PSR ¶¶ 63-65, at 16-17.  He dropped out of school after sixth grade, see PSR ¶ 83, at 19,  and was subject to regular beatings, physical humiliation, and possible sexual abuse at the hands of his brother and other boys in the CYFD's

care, see PSR ¶ 65, at 17; id. ¶ 79, at 19.  Sangiovanni was never adopted and "aged out" of the system.  PSR ¶ 65, at 17.

Sangiovanni has never had a job, save for a one-week stint at Taco Bell.  See PSR ¶ 86, at 19.  He has never been married, although he says he maintains a strong relationship with Walker, the now-27-year-old women with whom he had a child and for whom he was convicted of sexual exploitation of children.  See PSR ¶¶ 68-69, at 17.  His biological daughter from that relationship was adopted in a "closed" adoption, meaning that Sangiovanni's parental rights are terminated and he does not know the girl's present-day status.  See PSR ¶ 70, at 17.  Sangiovanni reports some history of substance abuse -- specifically, heroin, cocaine, and crystal methamphetamine -- but says that he has not used drugs since 2010.  See PSR ¶¶ 80-82, at 19.

### 2.     The Offense of Conviction.

The victim in this case is Shelby V., a seventeen-year-old girl who still lived with her mother and who had the misfortune of becoming the object of Sangiovanni's obsessive brand of "love."  PSR ¶¶ 6-7, at 4.   Shelby V. describes Sangiovanni as a mere "acquaintance," whom she only knew because he lived with her ex-boyfriend, Dallas Barth.[2]  See PSR ¶ 6, at 4.  On April 25, 2010, Shelby V. drove to a 7-Eleven convenience store to get some butter for her mother.  See PSR ¶ 20, at 6.  As she arrived, she saw Sangiovanni talking on a pay telephone and smoking a cigarette.  See id. ¶ 20, at 6.  Sangiovanni approached the car, opened the passenger-side door, and sat down inside, reaching over to turn off the ignition and throwing the keys to the floor by his feet.  See PSR ¶ 20, at 6.  The two began to argue, and eventually Sangiovanni

---

[2]Sangiovanni wrote a letter to Shelby V. from jail outlining her supposed lies to police.  See PSR ¶ 26, at 7.  This letter contains implications that Sangiovanni and Shelby V. had been sexually involved, that Barth had discovered them in bed, and that Barth's discovery was the cause of Barth terminating his relationship with Shelby V.  See PSR ¶ 26, at 7.

became agitated and pulled out a semiautomatic pistol, pulled back the slide mechanism, and pointed the gun at Shelby V. while keeping it on his lap.  See PSR ¶ 7, at 4; id. ¶ 20, at 6. According to Shelby V., Sangiovanni then said:

> I have no problem blasting the both of us right now, you first, then me.  I have no problem dying right now.  I was in prison for nine years.  I've lost everything and there's no way in hell I'm going to lose you to somebody else.  I'd rather die and kill myself and kill you right now and we can go to heaven together.

PSR ¶ 7, at 4.

Shelby V. unsuccessfully tried to catch the attention of passersby, but Sangiovanni told off the one person who walked up to the car to check on the pair.  See PSR ¶ 21, at 6. Sangiovanni gradually calmed down, and eventually allowed Shelby V. to enter the store and buy the butter and a coke.  See PSR ¶ 22, at 6.  Shelby V. entered the store and asked the clerk if she could use a telephone; before she was able to contact the authorities, Sangiovanni entered after her, hugged her from behind, and took her out to the car.  See PSR ¶ 22, at 6.  He briefly pinned her to the side of the car, grabbing her head and kissing her, and then told her that she could go, but if she told her family or law enforcement then he would kill her, her family, and himself.  See PSR ¶ 7, at 4; id. ¶ 22, at 6.

Shelby V. and her family called police immediately upon her arrival home.  See PSR ¶ 8, at 5.  Over the next week, Shelby V. and her mother received intimidating electronic mail transmissions and text messages from a telephone belonging to Barth -- Sangiovanni's roommate and Shelby V.'s ex-boyfriend -- including pictures of Shelby V. in bra and panties, and nude. See PSR ¶¶ 8-20, at 5-6.  Shelby V. had taken these pictures of herself in various stages of undress and stored them digitally on her iPod; apparently, Sangiovanni got ahold of her iPod and used it to transmit the images to another iPod.  See PSR ¶ 20, at 6.  These images were

interspersed with messages such as: "She lied about my brother[3] and tried to put him in prison cnm [sic4] will get them the high school will get them am [sic] myspace will get them we did' [sic] teach her she [sic]," PSR ¶ 11, at 5; "s [sic] been using for years an all her friends are the ones she gets meth from of [sic] the guys she prostitutes herself to," PSR ¶ 12, at 5; "[t]here is a lot more photos with worse stuff have a nice life sense [sic] you tore are [sic] family apart," PSR ¶ 13, at 5; "[i]t's easier to email all your wonderful daughters [sic] pictures or I would print thousands of them and give them to all her family members and put them evry where [sic] you guys go," PSR ¶ 14, at 5; "[i]f I get extra money I should still do that," PSR ¶ 15, at 5; and "[y]our meth whore daughter brought this on your family because you believe her lies," PSR ¶ 16, at 5.  Barth was charged in the New Mexico state system with two counts of bribery or intimidation of a witness, continued bribery or intimidation of a witness, and use of a telephone to harass, but all charges against him were dropped because the prosecution decided that it could not prove them beyond a reasonable doubt.  See PSR ¶ 28, at 7.

Although Shelby V. reported these events to police as they occurred in April, 2010, Sangiovanni was apparently not arrested for over two years.  See PSR ¶ 23, at 7.  On May 3, 2012, Sangiovanni sent Shelby V. an image of him in a surgical mask, latex gloves, and a smock, holding a pistol to his head.  See PSR ¶ 23, at 7.  He stated that, "[i]f she did not go to him by noon, . . . he was going to her."  PSR ¶ 23, at 7.  At this point, the school's resident police officer initiated a safety plan for the protection of Shelby V. and of the other students at her school, and, later that day, Sangiovanni was located and arrested.  See PSR ¶ 23, at 7.

---

[3]Barth and Sangiovanni are not brothers by birth or adoption, but Barth refers to Sangiovanni as his brother, and Sangiovanni was introduced to Shelby V. as Barth's brother. See PSR ¶ 18, at 6.

[4]The Court believes that Barth was trying to say "CNN," the Cable News Network.

## **PROCEDURAL BACKGROUND**

Sangiovanni was convicted of being a felon in possession of a firearm at the conclusion of a two-day jury trial running from March 19 to 20, 2013. See Clerk's Minutes, filed March 19, 2013 (Doc. 75). With regard to sentencing, the PSR recommends a base offense level of 32, which corresponds to that for kidnapping, and not for being a felon in possession of a firearm. See PSR ¶ 35, at 8-9. The USPO says that the felon-in-possession guideline directs courts to apply the base offense of any more serious crime -- including kidnapping -- in place of the felon-in-possession guideline, if the more serious crime is established by a preponderance of the evidence. See PSR ¶ 35, at 8-9 (citing U.S.S.G. §§ 2K2.1(c)(1)(A), 2X1.1, 2A4.1). The USPO concludes, upon surveying the evidence, that Sangiovanni's conduct satisfies the definition of kidnapping under New Mexico law. See PSR ¶ 35, at 8-9. The PSR also adds a two-point enhancement for use of a dangerous weapon,[5] see PSR ¶ 36, at 9 (citing U.S.S.G. § 2A4.1(b)(3)),

---

[5]The Court notes that enhancing a conviction for being a felon in possession of a firearm with an enhancement for using a "dangerous weapon" -- a term that includes all firearms -- might constitute impermissible double-counting. E.g., United States v. Pacheco, No. CR 13-2643 JB, 2014 WL 3421063, at *9-14 (D.N.M. July 8, 2014)(Browning, J.). "Double counting occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000)(Kelly, J.). This case does not present the typical double counting scenario, because it involves a necessary element of the statutory offense being used to enhance the Guidelines sentence for that offense. Moreover, such an argument would fail, because the enhancement requires that "a dangerous weapon was used" in the commission of the kidnapping, U.S.S.G. § 2A4.1(b)(3) (emphasis added), which would seem to encompass a narrower swath of conduct than the statute's requirement that the defendant "ship or transport . . . or possess . . . or . . . receive any firearm," 18 U.S.C. § 922(g). Also, even if the enhancement were for mere possession of a firearm, it would probably still not constitute double counting because the provision enhances only the sentences of felons in possession of firearms who also commit kidnapping. Basically, the situation is analytically indistinct from one in which the starting offense level of the kidnapping cross reference is two points higher.

Although this issue is interesting, the Court will not consider it further, because: (i) Sangiovanni did not specifically object to this enhancement, opting instead to put all his eggs in the "the kidnapping guideline does not apply" basket; (ii) as a result of (i), the double counting

and a two-point enhancement for obstruction of justice, see PSR ¶ 39, at 9-10 (citing U.S.S.G. § 3C1.1), for an adjusted offense level of 36, see PSR ¶ 40, at 10.

The USPO calculates Sangiovanni's criminal history category by adding: (i) 3 points for his 1999 sexual exploitation of children crime, see PSR ¶ 46, at 11-12 (citing U.S.S.G. § 4A1.1(a)); (ii) 3 points for his 2000 embezzlement and false reporting crimes, see PSR ¶ 47, at 12 (citing U.S.S.G. § 4A1.1(a)); (iii) 3 points for his 2001 battery upon a peace officer, see PSR ¶ 48, at 12-13 (citing U.S.S.G. § 4A1.1(a)); (iv) 3 points for his 2004 attempt to traffic a controlled substance crime, see PSR ¶ 49, at 13 (citing U.S.S.G. § 4A1.1(a)); and (v) 3 points for his 2009 failure to register as a sex offender crime, see PSR ¶ 50, at 13 (citing U.S.S.G. § 4A1.1(a)). The sum total of Sangiovanni's criminal history points, based on the guidelines applied by the USPO, is 15. See PSR ¶ 51, at 13. This total corresponds to a criminal history category of VI, see PSR ¶ 52, at 14, which, when matched against the final offense level of 36, indicates a Guidelines sentencing range of 324-405 months. See PSR ¶ 90, at 20. Because this range exceeds the statutory maximum sentence for Sangiovanni's crime of conviction, the USPO says that the sentence of the statutory maximum, 120 months, is indicated. See PSR ¶ 90, at 20.

Sangiovanni submitted the following one-line objection to the PSR: "The defendant objects to the cross-reference applied in the guideline calculations." Addendum to the Presentence Report at 1. The USPO refused to alter its position that the cross reference should apply. See Addendum to the Presentence Report at 1-3. Sangiovanni elaborated on this position in his sentencing memorandum, arguing that the alleged kidnapping offense -- of which he was

---

issue has not been briefed; (iii) even if the Court were to decline to apply the enhancement, but still apply the kidnapping enhancement, Sangiovanni would be subject to a Guidelines-calculated sentencing range of 262-327 months, which is still well above the statutory maximum of 120 months; and (iv) the Court ultimately finds that the kidnapping guideline does not apply, and so the issue is moot.

not convicted -- is the "tail . . . [that] wag[s] the dog" in the calculation of the sentence. Sangiovanni Memo. ¶ 4, at 3.  Sangiovanni's argument does not seem to be that the USPO mechanically misapplied the Guidelines, but rather, that the mechanically proper application of the Guidelines is unfair in his case.  He says at one point early on in his brief: "An increase in the guideline sentencing range of this magnitude based on findings not made by a jury beyond a reasonable doubt violates Mr. Sangiovanni's right to due process and trial by jury."  Sangiovanni Memo. ¶ 8, at 4.

Sangiovanni analogizes from Peugh v. United States, 133 S. Ct. 2072 (2013), in which the Supreme Court of the United States held that applying a version of the Guidelines that came into effect after the defendant's commission of the crime violated the Ex Post Facto Clause of the Constitution of the United States.  See Sangiovanni Memo. ¶ 8, at 4-5.  He asserts that, "even after [United States v.] Booker, [543 U.S. 220 (2005),] the sentencing guidelines 'impose a series of requirements on sentencing courts that cabin the exercise of [the sentencing court's] discretion.'"  Sangiovanni Memo. ¶ 8, at 5 (alteration in original)(quoting Peugh v. United States, 133 S. Ct. at 2084).  Sangiovanni concedes that the Supreme Court "recognize[s] an 'analytical distinction' between issues arising under the *Ex Post Facto* clause and those arising under the Sixth Amendment," but its "examination of the de facto, virtually mandatory impact of the post-Booker guidelines clearly acknowledge[s] the conditions that implicate Mr. Sangiovanni's right to a jury trial on the charges for which he is to be sentenced." Sangiovanni Memo. ¶ 9, at 5 (emphasis in original)(quoting Peugh v. United States, 133 S. Ct. at 2088).  Sangiovanni also argues from Alleyne v. United States, 133 S. Ct. 2151 (2013), contending that, because the factual question whether he committed kidnapping results in an

increase in the minimum sentence he faces, a jury must decide that question beyond a reasonable doubt.  See Sangiovanni Memo. ¶ 10-12, at 5-8.

Sangiovanni argues that the Court should apply the Guidelines essentially as they would be applied if § 2K2.1(c)(1)(A), the cross-reference provision, were excised.  See Sangiovanni Memo. ¶ 5, at 3.  He acknowledges that, because he has two prior felonies for either violence or a controlled substance offense -- one of each, in fact -- he would begin with an offense level of 24.  See Sangiovanni Memo. ¶ 5-6, at 3-4 (citing U.S.S.G. § 2K2.1(a)(2)).  He notes, without explicitly conceding, that the USPO "has added two levels for obstruction of justice, raising the offense level to 26."  Sangiovanni Memo. ¶ 6, at 4.  Sangiovanni then concludes: "The guideline sentencing range for offense level 26, criminal history category VI, is 120-150 months.  This should be the starting point for Mr. Sangiovanni's sentencing calculation, not the range of 324 months to 405 months posited in the PSR."  Sangiovanni Memo. ¶ 6, at 4.

As a fallback argument to his "the tail should not wag the dog" argument, Sangiovanni contends that the facts do not establish that he is guilty of kidnapping.  Sangiovanni Memo. ¶¶ 14-15, at 8-9.

> Sangiovanni got into Shelby's vehicle in an attempt to talk to her about his feelings and their relationship.   Mr. Sangiovanni's mental health history is discussed below; however, it is clear that Mr. Sangiovanni's emotions were verging on the extreme during this conversation.  Mr. Sangiovanni did not "hold the victim . . . for ransom; or as a hostage or shield; or to inflict death, physical injury or a sexual offense on victim; or for the purpose of making victim do something or for the purpose of keeping the victim from doing something".  See PSR at 8-9.  He expressed his passionate feelings for several minutes, then let her go into the convenience store where they were parked to run her errand.  She went home to her mother when that was done.  Whatever happened on the day of the incident, Mr. Sangiovanni did not commit the offense of kidnapping.  The cross-reference, in addition to being offensive to fundamental notions of fairness and due process, is factually inapposite.

Sangiovanni Memo. ¶ 15, at 8-9.  Sangiovanni also has a standard of proof to go with his factual

assertions, arguing that the Court should use a clear and convincing evidence standard to assess

the question whether his conduct satisfies the elements of kidnapping.  See Sangiovanni Memo.

¶ 13, at 8 (citing United States v. Staten, 466 F.3d 708, 717-20 (9th Cir. 2006)).

Sangiovanni openly addresses an obvious question that his argument raises,

acknowledging that, "[a]t first blush, Mr. Sangiovanni's argument may seem superfluous: if the

longest sentence that can be imposed is 120 months, and the lowest calculation of the guideline

sentencing range is 120 months, what difference does all this make?  Mr. Sangiovanni seeks a

variance from the guideline sentencing range."  Sangiovanni Memo. ¶ 7, at 4.  Basically,

Sangiovanni recognizes that the Court is more likely to grant a variance slightly below the

Guidelines range than one 224 months below the Guidelines range.  See Sangiovanni Memo. ¶ 7,

at 4.  To support his variance argument, Sangiovanni refers to his mental health history, alludes

to severe drug problems, and asserts that "treatment and counseling have a substantial potential

for vastly improving Mr. Sangiovanni's mental health, which would serve the aims of federal

sentencing far better than a draconian term of imprisonment."  Sangiovanni Memo. ¶ 19, at 10.

Sangiovanni later filed a supplement to the Sangiovanni Memo., bringing United States

v. Lake, 530 F. App'x 831 (10th Cir. 2013)(Anderson, J.)(unpublished), to the Court's attention.

See  Supplement  to  Mr.  Sangiovanni's  Sentencing  Memorandum,  filed  August  15,  2013

(Doc. 86)("Sangiovanni Supp.").  United States v. Lake involves an interpretation of Alleyne v.

United States, and Sangiovanni summarizes the case as follows:

> In Lake, the defendant was charged with conspiring to possess heroin with intent
> to distribute.  The defendant, a dentist, shared some heroin which he had received
> from his son with another heroin addict.  That other person died of a heroin
> overdose.  The defendant's sentence was enhanced as a result of the death, a fact
> which was not found by a jury or admitted by the defendant.  Citing Alleyne v.
> United States, the Tenth Circuit reversed the sentence.  The sentence was reversed

because the guideline sentencing range was increased by a fact not found by a jury or admitted by the defendant.

Sangiovanni Supp. ¶ 2, at 2 (citation omitted).

The United States replied, outlining its interpretation of Alleyne v. United States.  See United States' Response to Defendant's Sentencing Memorandum at 2-3, filed August 21, 2013 (Doc. 90)("Response").  It asserts that Alleyne v. United States holds that "any fact which increases the *mandatory minimum sentence* is an element of the crime which must be submitted to the jury," but that, "[f]or convictions under the felon in possession statute, there is no mandatory minimum sentence," so the case is inapposite.  Response at 2 (emphasis in original)(citation omitted).  The United States's argument hits a stumbling block in responding to United States v. Lake, which the United States contends can be distinguished only on the basis of an improvident concession by the prosecution in that case; for the most part, the United States just takes the position that United States v. Lake was wrongly decided and -- as the case is unpublished -- that the Court should ignore it.

> As for Defendant's supplemental proffered [sic] United States v. Lake, a narcotics case which seems to directly go against the Alleyne holding, the United States conceded that Alleyne applied.  That is not the case here.
>
> Moreover, the Lake decision cannot be correct.  If the Alleyne decision applies to guideline enhancements that do not increase the statutory minimum or maximum sentence for a particular offense, then every single finding set forth in the presentence report, every guideline adjustment in every case before this Court is invalid because it was not submitted t[o] a jury and proven beyond a reasonable doubt.  Under the rationale from Lake, the dozens of sentence[s] imposed by this Court every week are invalid and must be overturned on appeal or through collateral proceedings.  Every sentence that this Court has imposed since Apprendi [v. New Jersey, 530 U.S. 466 (2000),] is invalid.

Response at 3 (citation omitted).

The United States devotes most of the remainder of its brief to paraphrasing facts from the PSR, which the Court has already summarized above.  See Response at 3-13.  It makes clear,

however, that it opposes Sangiovanni's request for a downward variance, arguing that "[a] reasonable sentence is one at the statutory maximum, far below Defendant's guideline sentencing range."  Response at 13.

The Court held a sentencing hearing on October 18, 2013.  See Transcript of Hearing (taken October 18, 2013)("Oct. 18, 2013 Tr.").[6]  The Court asked the United States if the "best argument [it] could make is that [United States v. Lake] is incorrect."  Oct. 18, 2013 Tr. at 5:7-8 (Court).  Sangiovanni largely repeated the arguments from his brief, emphasizing the Supreme Court's emerging consciousness that the Guidelines still remain important -- if not binding -- even after United States v. Booker.  See Oct. 18, 2013 Tr. at 27:1-37:5 (Robert, Court, Cairns). The United States repeated its contention that the case was either wrongly decided or based on an improvident concession:

> The Government conceded the issue stupidly.  Stupidly.  If I sound angry about that, I am.  I can't imagine who made that decision, but the Government conceded the issue.  But clearly it's against so many other decisions from both the Supreme Court and the Tenth Circuit that again, perhaps, Your Honor, you can distinguish it.  But if you can't distinguish it, it's irreconcilable with other Tenth Circuit law.
>
> So I guess that's all I have to say.  And I'm sorry.

Oct. 18, 2013 Tr. at 47:3-13 (Cairns).

The parties then discussed the factual question whether Sangiovanni's conduct violated New Mexico's kidnapping statute.  Looking at the four disjunctive prongs of N.M. Stat. Ann. § 30-4-1, the Court asked which one, if any, Sangiovanni's conduct met.  See Oct. 18, 2013 Tr. at 7:3-11 (Court).  The USPO stated that his conduct satisfied the third prong, "with intent . . . that the victim be held to a service against the victim's will."  N.M. Stat. Ann. § 30-4-1A(3).  See

---

[6]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Oct. 18, 2013 Tr. at 7:12-13 (Probation Officer).  The Court expressed skepticism, noting that, while "not an expert about New Mexico kidnapping law, . . . the word 'to service' there would suggest to me sort of a slavery, a house bondage sort of situation, [or] servitude."  Oct. 18, 2013 Tr. at 7:16-19 (Court).  The USPO later confessed that it did not have much in the way of analysis to back up its conclusion, see Oct. 18, 2013 Tr. at 11:1-4 (Court, Probation Officer)("THE COURT:  Got any more thoughts on that, Ms. Pedraza?  PROBATION OFFICER:  Not particularly, Your Honor."), but had applied the guideline after noticing that Sangiovanni had been charged with kidnapping in New Mexico state court before the case became federal, see Oct. 18, 2013 Tr. at 16:25-17:8 (Probation Officer).  The United States suggested that the fourth prong, "with intent . . . to inflict death, physical injury or a sexual offense on the victim," was more appropriate.  N.M. Stat. Ann. § 30-4-1A(4).  See Oct. 18, 2013 Tr. at 7:23-24 (Cairns).  The Court responded that "the problem I have with 4 is [that Sangiovanni] had to have the intent to inflict death, physical injury, or sexual offense on the victim.  And we [have] got an unloaded gun here."  Oct. 18, 2013 Tr. at 7:25-8:3 (Court).  The United States countered that Sangiovanni forced Shelby V. to kiss him at the end of the encounter and that this act would qualify as a sexual assault.  See Oct. 18, 2013 Tr. at 8:8-13 (Cairns).

The Court suggested that perhaps the second prong, "with intent . . . that the victim be held as a hostage or shield and confined against his will," might be the best prong to consider.  N.M. Stat. Ann. § 30-4-1A(2).  See Oct. 18, 2013 Tr. at 8:14-19 (Court).  All parties agreed that Shelby V. was never used as a "shield," Oct. 18, 2013 Tr. at 8:20-22 (Cairns, Court), so the Court and the United States then discussed at what point in the encounter, if ever, Shelby V. became a "hostage," Oct. 18, 2013 Tr. at 9:4-6 (Court).  The United States conceded that Shelby

- 14 -

V. was probably never a hostage before getting out of the car to get the butter and ask the

shopkeeper to use the telephone:

> Well, I've got the transcript of her testimony here in my hand, and I can even read
> from portions of it, where he says -- this is going to be in the transcript of the trial
> testimony; it's just the transcript of the testimony of [Shelby V.] . . . .
> Sangiovanni[] gets into her vehicle, and he has a weapon.  He leaned back -- and
> this is what she said, "All of a sudden he leaned back, leaned forward a little, and
> then he came back and had a handgun between his legs.  And I recognized the gun
> as that belonging to Dallas Green.
>
> "Mr. Sangiovanni said, 'I'll blast you,' and he said, 'I'm not afraid to blast
> you and me right here.  I'm not scared to die.  I'd rather die and go to heaven with
> you than loose [sic] you to someone else.'"
>
> And I asked her, "How long did this continue?"
>
> And she said approximately, or probably 10, 15 minutes is how long it
> continued.
>
> And then at this point in time where she said, I need to get butter.  I need
> to go.  I need to get home.  And I asked her, and "So did he allow you to leave the
> vehicle?"
>
> And she said, "Yes, he let me step out of the vehicle into the 7-Eleven."
> And then --
>
> THE COURT:  So would you agree with me up to this point it would be
> hard to say that the defendant or the victim was being held as a hostage and
> confined against her will at that point?
>
> MR. CAIRNS:  Yes, I would agree.

Oct. 18, 2013 Tr. at 9:7-10:17 (Cairns, Court)(quoting Transcript of Trial at 12:6-21 (Shelby V.,

Cairns), filed August 19, 2013 (Doc. 89); id. at 13:10-20 (Shelby V., Cairns)).

The United States then described the rest of the facts, concluding with Sangiovanni's

threat to kill Shelby V. and her parents.  See Oct. 18, 2013 Tr. at 13:8-14:3 (Cairns).  It then

argued that "there is no time limit.  I think if she's detained against her will even for just a few

seconds, it can still satisfy the elements of this crime, because again it doesn't say that it has to

be for any particular time frame." Oct. 18, 2013 Tr. at 14:10-15 (Cairns). The Court then asked why Sangiovanni's conduct would not constitute mere false imprisonment. See Oct. 18, 2013 Tr. at 14:16-35 (Court). When it became clear that the United States did not have a good answer, the Court inquired about which "sexual offense" the United States contends that Sangiovanni perpetrated when he forced Shelby V. to kiss him. Oct. 18, 2013 Tr. at 14:22-25 (Court); id. at 15:4-6 (Court). The United States responded that "[i]t would be a battery." Oct. 18, 2013 Tr. at 15:7 (Cairns). It argued that, "if the battery has a sexual component, which this clearly did," then battery counts as a "sexual offense" for the purposes of § 30-4-1. Oct. 18, 2013 Tr. at 15:10-20 (Cairns). The Court concluded discussion of the issue with the United States by stating that it would look for jury instructions on kidnapping. See Oct. 18, 2013 Tr. at 17:10-16 (Court).

Sangiovanni argued that his conduct was, in fact, mere false imprisonment. See Oct. 18, 2013 Tr. at 22:1-11 (Robert). The Court asked Sangiovanni whether his conduct would violate another New Mexico statute, resulting in the cross-reference still being applied -- just not to the kidnapping guideline. See, e.g., Oct. 18, 2013 Tr. at 21:6-9 (Court). Sangiovanni responded that he did not know for sure, but he suspected that the kidnapping "statute was chosen [only] because it offered the most Draconian guideline sentence to be applied to this case." Oct. 18, 2013 Tr. at 21:3-5 (Robert). He noted that, if the USPO "had selected battery or assault, [that] would [not] have jacked the sentence up into the 300[-month] range." Oct. 18, 2013 Tr. at 21:7-10 (Court, Robert). He conceded that "[t]here would have been an increase, but there wouldn't have been nearly the increase that results from the kidnapping." Oct. 18, 2013 Tr. at 21:12-14 (Robert).

Arguing for his variance, Sangiovanni put forth the following:

[W]hen you look at [Sangiovanni's] background, you can see that he really never
had a chance. I mean, his mother had terrible psychological problems. He,

himself, had been institutionalized with various problems from the time that he was young, elementary school age, and spent a lot of time in prison.  And you know, with apologies to Christian, he's somebody that really has never learned how to interact with folks.  The vast majority of his life, certainly . . . most . . . of his life[] after he[ was] a toddler has been spent in institutional settings.  It shouldn't come as a surprise that his reaction to Shelby in those circumstances was wildly out of proportion to what it ought to have been.

And so the whole picture -- this was not a kidnapping. . . .  [W]hen you look at what was really going on here, a young man who was misapprehending his relationship with this young lady, who didn't know how to express what he felt in other ways than he did, and given the horrific difficulty of his background, I think those are really important things to consider in determining what to do with Christian Sangiovanni.

I mean, he's going to spend a lot of time in prison regardless of what you do, you know, years, eight years, six years, whatever it may be, it's a lot of time.  And he's going to come out having to, you know, do what he tried to do before, which is to learn how to live in the world.  In his letter to you he tells you that he wants to do that.  He wants to learn how to live in the world.  And he's told me dozens of times that he doesn't want to be where he is.  He doesn't want to be doing what he's doing.  He doesn't want to spend the rest of his life or any significant part of the rest of his life in prison.

And so one of the things -- and I'll ask you about this at the end -- he's asked me to do is to investigate the BOP facilities that offer employment training programs, specifically Unicorps programs, where somebody comes out of prison with a saleable, marketable skill, so he can get a job and at least have a chance at starting to live a life that looks more normal, more real, and doesn't involve the constant risk of incarceration.

And so, Your Honor, I don't think that a 120 month is sentence is necessary.  I think it's more than necessary, and I think it's, given the entirety of the circumstances here that I've talked about in writing and in here, that a lower sentence would be sufficient to accomplish the aims of federal sentencing.

Oct. 18, 2013 Tr. at 38:6-40:9 (Robert).

The Court indicated that it would take the sentence under advisement, but that it was not inclined to find that Sangiovanni's conduct constitutes kidnapping.  See Oct. 18, 2013 Tr. at 40:12-41:11 (Court).  It also indicated that the United States v. Lake decision "can't be right." Oct. 18, 2013 Tr. at 43:7-9 (Court).  The Court started to opine that another cross-referenced

guideline -- such as one for aggravated assault or battery -- would likely apply, when the USPO interjected to inform the Court that no other cross-reference guideline could apply, because no other cross-referenced guideline would result in an offense level greater than that of the un-cross-referenced felon-in-possession guideline.  See Oct. 18, 2013 Tr. at 49:23-50:17 (Probation Officer, Court).  The USPO noted that, if the cross reference were to not apply, Sangiovanni would be subject to an additional four-point enhancement for "commit[ting] the felon in possession offense in connection with another felony."  Oct. 18, 2013 Tr. at 51:9-13 (Cairns, Probation Officer).  The Court then invited the parties to stipulate to an offense level of 30, with the United States conceding that neither the kidnapping cross reference nor any other cross reference applies, and with Sangiovanni conceding that the 4-level enhancement for possessing the firearm in connection with another felony applies.  See Oct. 18, 2013 Tr. at 51:21-52:8 (Court).  The United States agreed, see Oct. 18, 2013 Tr. at 52:9-15 (Cairns), but Sangiovanni said that, while he appreciated the Court's suggestion, he would need some time to think about it, see Oct. 18, 2013 Tr. at 52:15-21 (Robert).  The Court adjourned the hearing without sentencing Sangiovanni.

After the hearing, the United States submitted another short brief revising its stance on United States v. Lake.  See U.S. Memo. at 4-5.  It argues that United States v. Lake is distinguishable, because that case involves a factual finding triggering the increase of a statutory -- not a Guidelines -- minimum.

Lake received a guideline adjustment pursuant to U.S.S.G. § 2D1.1(a)(2), which reads:

(a)     Base Offense Level (Apply the greatest):

. . . .

> (2)     38, if the defendant is convicted under
> 21 U.S.C. § 841(b)(1)(A), (b)(1)(B), or
> (b)(1)(C), or 21 U.S.C. § 960(b)(1), (b)(2),
> or (b)(3), and **the offense of conviction**
> establishes that death or serious bodily
> injury resulted from the use of the
> substance; or

> The highlighted portion of the guideline provision is the distinguishing factor between the Tenth Circuit decision in Lake and defendant Sangiovanni's case. The guideline adjustment is based on the statute of conviction, not relevant conduct. Therefore, in order for the Court to apply this adjustment, it must have found by a preponderance of the evidence that Lake had violated 21 U.S.C. § 841(b)(1)(C), and specifically the portion of that statute that addressed death or bodily injury. Because that finding increased the statutory minimum and maximum, it violated Apprendi v. New Jersey, 530 U.S. at 466.

> Unlike U.S.S.G. § 2D1.1(a)(2), the guideline provision in Sangiovanni's case, U.S.S.G. § 2K2.1, does not reference the statute of conviction, and like the majority of the guideline provisions, can be established by relevant conduct and applied by the Court based on a preponderance of the evidence standard.

> . . . .

> It should still have been harmless error on appeal because Lake did not receive a sentence based on the mandatory minimum.

U.S. Memo. at 4-5, 5 n.1 (first omission in original)(emphasis in U.S. Memo. but not source).

The USPO released a memorandum on December 11, 2013, with an amended PSR attached. See Memorandum Regarding Christian Alexander Sangiovanni, disclosed December 11, 2013 ("PSR Memo."). The PSR Memo. "omit[s] the cross reference to Kidnapping in the sentencing guideline calculations." PSR Memo. at 1. The USPO suggests a base offense level of 24 pursuant to U.S.S.G. § 2K2.1(a)(2), because Sangiovanni was convicted of this offense after previously being convicted of two felonies either of violence or of controlled substance violations. See PSR Memo. ¶ 35, at 8. The USPO then applies a 4-level enhancement for "possess[ing the] firearm in connection with another felony offense," that being aggravated assault. PSR Memo. ¶ 36, at 8. The USPO does not suggest that the Court cross reference to

- 19 -

aggravated assault; rather, it contends that the finding that Sangiovanni possessed the firearm in connection with another felony is a finding that is internal to the felon-in-possession guideline -- meaning that the Court would not throw out the felon-in-possession guideline and substitute it with the aggravated assault guideline, but rather would make a supplemental finding called for by the felon-in-possession guideline.  See PSR Memo. ¶ 36, at 8.  The USPO then applies the obstruction-of-justice enhancement from the original PSR, resulting in a total offense level of 30. See PSR Memo. ¶¶ 39, 43, at 9.

The Court held a second sentencing hearing on December 16, 2013, using the PSR Memo.'s revised calculation as a starting point for discussion.  See Transcript of Hearing at 2:18-3:1 (Court)(taken December 16, 2013)("Dec. 16, 2013 Tr.").  Sangiovanni essentially adapted the argument that he had used on the kidnapping cross reference to the PSR Memo.'s 4-level enhancement for possessing the firearm in connection with another felony, noting that he "was not charged with aggravated assault, at least in this Court."  Dec. 16, 2013 Tr. at 4:10-11 (Robert).  Sangiovanni repeated his earlier arguments about how a sentence enhancement based on him having committed a crime of which he was not convicted violated his Sixth Amendment and Due Process rights.  See Dec. 16, 2013 Tr. at 4:20-7:19 (Robert).

> I want to make those specific objections [to the application of the aggravated assault enhancement] and again it's not quite the same as it was before [when the Court was considering applying the cross reference to the kidnapping guideline] but it's enough of a blood relative that I think the same arguments apply.

Dec. 16, 2013 Tr. at 8:3-6 (Robert).

Sangiovanni also addressed the United States' attempt to distinguish United States v. Lake in its U.S. Memo.:

> I think the distinction doesn't stand up to scrutiny of the -- and of course scrutiny of this case doesn't take very long.  Lake is essentially a page.  But it's clear that in that opinion Lake addresses the facts found by the sentencing judge which

increase the sentence. The <u>Lake</u> opinion refers to section 2D1.1, and the facts found that are relevant to the sentencing court in <u>Lake</u>'s determination of the appropriate guideline sentencing range in that case.

. . . .

I disagree with the Government in claiming that there is a distinction because it's related to statutory things and not guidelines things. <u>Lake</u> says different. <u>Lake</u> says it's a guideline question. And it's a guideline question. It's a question of judge found facts that increase a guideline sentencing range. That's what <u>Lake</u> is about.

Dec. 16, 2013 Tr. at 6:11-20 (Robert); <u>id.</u> at 7:10-17 (Robert).

Sangiovanni then argued for a downward variance, focusing extensively on his unfortunate upbringing and extensive mental health history. See Dec. 16, 2013 Tr. at 8:6-12:9 (Robert). He opined that the Bureau of Prisons ("BOP") would not "send him to a psychologically oriented place because that's not what's happening right now. Because they just don't have room. And I think those designations are reserved for those in the most extreme, dire, patent need. . . . Sangiovanni doesn't present with that." Dec. 16, 2013 Tr. at 9:6-11 (Robert). He noted that one of his major concerns with being sentenced to the maximum was the security classification that the BOP would assign him with the higher sentence. See Dec. 16, 2013 Tr. at 10:11-15 (Robert). He asserted that this classification would determine whether he was put in a maximum security facility, a medium one, a minimum one, or a camp. See Dec. 16, 2013 Tr. at 10:15-17 (Robert). He conceded that there are "a bunch of other criteria that BOP considers" other than the length of the sentence imposed, but that length of sentence is a major factor in him being sent somewhere with good vocational and rehabilitative facilities. See Dec. 16, 2013 Tr. at 10:17-11:4 (Robert).

Sangiovanni listed a number of facilities in which he would like to serve his sentence, namely, those in Phoenix, Arizona; Pekin, Illinois; Big Spring, Texas; and Safford, Arizona. See

Dec. 16, 2013 Tr. at 11:16-12:1 (Robert).  The Court asked the USPO whether any of those facilities would be suitable for Sangiovanni, and the USPO stated that, out of those facilities, "Phoenix and Pekin would be most appropriate."  Dec. 16, 2013 Tr. at 14:9-10 (Probation Officer).  The USPO further noted that, although it could not "really say for sure that [Sangiovanni] would qualify for a low[-security] facility based on his criminal history and . . . offense," it "did recommend the 500 hour drug treatment program, and it is not available at [B]ig [S]pring or Safford but it is available at Phoenix and Pekin."  Dec. 16, 2013 Tr. at 14:10-12 (Probation Officer); id. at 14:13-16 (Probation Officer).  The Court asked Sangiovanni which facility he would prefer between Phoenix and Pekin, and Sangiovanni opted for Phoenix.  See Dec. 16, 2013 Tr. at 14:20-25 (Robert).

After elaborating on his attempts in the U.S. Memo. to distinguish United States v. Lake, the United States countered Sangiovanni's request for a variance.  See Dec. 16, 2013 Tr. at 27:18-29:4 (Cairns).  The United States noted that it was "not completely without pity for the defendant," who, it said, "has had a very difficult life, and a terrible childhood."  Dec. 16, 2013 Tr. at 27:18-20 (Cairns).  The United States asserted, however, that it had "seen people who are armed career criminals who receive a mandatory minimum of 15 years in prison who have far less violent histories, and certainly the offense conduct involved far less violence than Mr. Sangiovanni."  Dec. 16, 2013 Tr. at 28:2-10 (Cairns).  It also asserted that Sangiovanni had "missed the armed career criminal adjustment only by one conviction," and that his "criminal history is significant and is in many way[s ] reprehensible."  Dec. 16, 2013 Tr. at 28:19-23 (Cairns).

The Court then went through the 18 U.S.C. § 3553(a) factors, concluding that Sangiovanni "didn't have a chance" because of his childhood, which puts downward pressure on

his sentence.  Dec. 16, 2013 Tr. at 31:2-4 (Court).  The Court noted, however, that the violent nature of the crime and of Sangiovanni's criminal history, as well as the failure of prior imprisonment to deter his criminality, put upward pressure on the sentence.  See Dec. 16, 2013 Tr. at 31:4-11 (Court).  The Court concluded that 120-months imprisonment "is necessary to reflect the seriousness of the offense[ and] promote respect for the law."  Dec. 16, 2013 Tr. at 31:12-14 (Court).  The Court pointed out the need for both general and specific deterrence, noting that specific deterrence was of special concern: "[T]o go 60 months after he served . . . a nine year sentence . . . [and commit this crime shows a need] to provide specific deterrence in this case . . . ."  Dec. 16, 2013 Tr. at 31:17-21 (Court).  The Court then sentenced Sangiovanni to 120-months imprisonment with a recommendation for the 500-hour drug and alcohol program, and three-years supervised release with the following special conditions and with the rationales for the conditions:

> The defendant must participate in and successfully complete an outpatient substance abuse treatment program approved by the probation officer, which [m]ay include testing[.]   The defendant is prohibited from obstructing or attempting to obstruct or tamper in any fashion with the collection efficiency and accuracy of any substance abuse testing device or procedure[.]  The defendant may be required to pay a portion of the cost of treatment and/or drug testing to be determined by the probation office.  This condition is imposed based on the defendant's history of substance abuse[.]  The defendant must submit to a search of his person, property, or automobile under his control to be [conducted in] a reasonable manner, reasonable time[,] for the purpose of detecting weapons[,] at the direction of the probation officer.  He must inform any residen[ts] that the premises may be subject to a search.  This condition is imposed based on this federal offense in which the defendant was in possession of a firearm[.]  The defendant must refrain from the use and possession of alcohol and other forms of intoxicants.  This condition is imposed based on the defendant's history of abuse and history of mental health issues[.]  The defendant must refrain from the use and possession of . . . cannabinoids or other legally sold designer drugs.  This condition is imposed based on the defendant's history of substance abuse[.]  The defendant must participate in and successfully complete an outpatient mental health treatment program approved by the probation officer[.]  The defendant may be required to pay a portion of the cost of the treatment to be determined by the probation officer.  This condition is imposed based on the defendant's history of

abuse and history of mental health issues.  The defendant shall reside at and complete a program at a residential reentry center approved by the probation officer for a period of six months.  This condition is imposed based on the defendant's history of long period[s] of incarceration, [and] his lack of [a] stable home environment to assist him with employment and [reentry] into the community[.]  The defendant must not have contact with children under the age of 18 without prior written permission of the probation officer [and] must immediately report unauthorized contact with children to the probation officer.  This condition is imposed based on the defendant's prior sex [of]fen[s]e . . . . [w]hich included pictures [of a] minor in a sexual act[,] and a current offense [in] which [a] minor female . . . was 17 and the defendant had pictures of her in her [underwear].  Immediately upon the defendant's commencement of supervision or as soon as possible thereafter[,] the defendant shall undergo a risk assessment and other psych[o]sexual evaluation[,] and[,] if recommended[,] begin participating in sex offender treatment consistent with the recommendation of the assessment and/or evaluation.  Furthermore[,] the defendant shall commit submit[] to [undergo] polygraph testing and any other specific sex offender testing as directed by the probation officer[.]  The defendant may be required to pay a portion of the cost of testing or treatment as determined by the probation officer.  This condition is imposed based on the defendant's predicate se[x] offense.  It is also recommended to assess the defendant's risk, determine his treatment needs[,] and effectively protect the community.  Base[d] on the defendant's lack of financial resources, the court[] will not impose a fine.  Defendant will [p]ay a special a[ssess]ment of $100 which is due immediately.

Dec. 16, 2013 Tr. at 33:25-36:20.  See Dec. 16, 2013 Tr. at 32:25-33:10 (Court).

## LAW REGARDING THE UNITED STATES SENTENCING GUIDELINES

In United States v. Booker, the Supreme Court severed the mandatory provisions from the Federal Sentencing Act, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

>       (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>       (B)     to afford adequate deterrence to criminal conduct;
>
>       (C)     to protect the public from further crimes of the defendant; and
>
>       (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

>       [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551.  To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

       Although the Guidelines are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many").  They are significant, because "the Guidelines are an expression of popular political will about

sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted).  A reasonable sentence is one that also "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory guideline sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a

different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1, cmt.

1(H). In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be

determined" based on the following:

(1)   (A)   all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

      (B)   in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)   solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)   all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)   any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.).  Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base

offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments provided by the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct." United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  515 U.S. at 401.  The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become

more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402. Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence. See 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. See United States v. Watts, 519 U.S. at 151. According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's results in <u>Witte v. United States</u> and <u>United States v. Watts</u>.  <u>See</u> <u>United States v. Andrews</u>, 447 F.3d 806, 810 (10th Cir. 2006)(applying <u>Witte v. United States</u>' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).   In <u>United States v. Banda</u>, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."   168 F. App'x at 290.   The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"   168 F. App'x at 290 (quoting <u>United States v. Lauder</u>, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In <u>United States v. Coleman</u>, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  <u>See</u> 947 F.2d at 1428.   The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  <u>See</u> <u>United States v. Coleman</u>, 947 F.2d at 1428-29 (citing <u>United States v. Duncan</u>, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); <u>United States v. Rodriguez</u>, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2–level enhancement for firearms possession, because "[t]o add

at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts

- 32 -

in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516

(citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[7]

## LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing guideline ranges are now advisory[8] and are

one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to

_____

[7]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  See United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level four-levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

[8]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the guideline ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory.").  The Court must consider the guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline range, see id. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated guideline range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir.

assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United

States, 552 U.S. at 50-51, the Supreme Court has made it clear that no presumption of

---

2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2–3 (D.N.M. July 16, 2010)(Browning, J.).

> The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

> . . . .

> The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, No. CR 10-1919-002, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

reasonableness attaches at the district court level to the sentence the Guidelines suggest, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. at 351 ("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).   Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.   See 18 U.S.C. § 3553(a)(1), (3)-(7).

In Kimbrough v. United States, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   552 U.S. at 89 (quoting Rita v. United States, 551 U.S. at 350).   The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular

case."  552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States so as to be able to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and thus, no variance from the guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

The Court will not apply the cross-reference provision of the felon-in-possession guideline, not because -- as Sangiovanni argues -- it would violate his Sixth Amendment rights, but because his conduct does not satisfy the elements of kidnapping under New Mexico or federal law.  Although his conduct would support a cross reference to another guideline, e.g., aggravated assault, no other guideline satisfies the cross-reference provision's requirement that its "resulting offense level [be] greater than that determined" by applying the un-cross-referenced felon-in-possession guideline.  U.S.S.G. § 2K2.1(c)(1)(A).  The Court concludes that the proper application of the Guidelines results in a final offense level of 30.  First, the Court concludes that the starting offense level under the felon-in-possession guideline is 24, because Sangiovanni "committed . . . the instant offense subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense."  U.S.S.G. § 2K2.1(a)(2).  Sangiovanni's prior convictions for battery upon a peace officer and attempting to traffic heroin

- 36 -

satisfy this requirement, and Sangiovanni concedes as much in his brief.  See Sangiovanni Memo. ¶ 6, at 4.  Second, the Court applies a 4-level increase because Sangiovanni "possessed [the] firearm . . . in connection with another felony offense," namely, his aggravated assault against Shelby V.  U.S.S.G. § 2K2.1(b)(6)(B).  See N.M. Stat. Ann. § 30-3-1.  Last, the Court applies the 2-level enhancement for obstruction of justice, which the PSR set forth and to which Sangiovanni has not objected.  See PSR ¶ 39, at 9-10 (citing U.S.S.G. § 3C1.1).

The Guidelines sentencing range for an offense level of 30 and a criminal history category of VI is 168-210 months, the bottom of which is 48 months above the maximum sentence the Court may impose for Sangiovanni's crime of conviction.  See 18 U.S.C. §§ 922(g)(1), 924(a)(2).  As the Guidelines are designed to calculate punishments proportional to a defendant's "real offense," the Court concludes that a sentence that comports with the considerations of § 3553(a) -- and that punishes Sangiovanni in a similar fashion to other defendants who committed substantially similar conduct -- would be one above the statutory maximum.  U.S.S.G. § 1A1.4(a).  When applying variances, the Court starts with the Guidelines range of 169-210 months, not the statutory maximum of 120 months.  Even if Sangiovanni's tragic upbringing and mental health rendered him deserving of a downward variance from the bottom of the Guidelines range, the Court concludes that he is not entitled to what would be tantamount to more than a 48-month variance.[9]  The Court therefore sentences him to the statutory maximum sentence of 120-months imprisonment.

---

[9]Sentencing Sangiovanni to 119 months or less would not technically be a 49-month variance; it would be a one-month variance.  The final step of the Guidelines -- in instances like this case, in which the Guidelines range turns out to be higher than the statutory maximum -- directs the sentencing judge to modify the otherwise-applicable sentencing range to be within the statute of conviction's maximum and minimum:

I.     **THE COURT WILL NOT APPLY THE KIDNAPPING GUIDELINE, NOT BECAUSE CROSS REFERENCE TO AN UNCHARGED CRIME WOULD VIOLATE THE SIXTH AMENDMENT, BUT BECAUSE SANGIOVANNI'S CONDUCT DOES NOT SATISFY THE ELEMENTS OF THE NEW MEXICO CRIME OF KIDNAPPING.**

The Court will not apply the kidnapping guideline, not because it cannot apply a cross

reference to a crime of which the defendant was not convicted, but because it finds, by a

---

     (a)     Where the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence.

     (b)     Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.

U.S.S.G. § 5G1.1(a)-(b).  This provision is the Guidelines Manual's reminder to district judges of an extra-Guidelines sentencing consideration: that statutory maximums and minimums trump Guidelines calculations.  In that way, § 5G1.1 is similar to the provision of the Guidelines that describes varying from the Guidelines:

     § 1B1.1.     Application Instructions

     (a)     The court shall determine the kinds of sentence and the guideline range as set forth in the guidelines (see 18 U.S.C. 3553(a)(4)) by applying the provisions of this manual in the following order, except as specifically directed:

     . . . .

     (b)     The court shall then consider Parts H and K of Chapter Five, Specific Offender Characteristics and Departures, and any other policy statements or commentary in the guidelines that might warrant consideration in imposing sentence.  See 18 U.S.C. 3553(a)(5).

     (c)     The court shall then consider the applicable factors in 18 U.S.C. 3553(a) taken as a whole.  See 18 U.S.C. 3553(a).

U.S.S.G. § 1B1.1(a), (b), (c) (emphasis added).

Section 5G1.1 had some additional value when the Guidelines were mandatory, as it resolves what would otherwise be a conflict between the Guidelines and the United States Code.  Even before United States v. Booker, statutory maximums and minimums trumped the Guidelines, and would have even if § 5G1.1 were not present.

- 38 -

preponderance of the evidence, that Sangiovanni is not guilty of kidnapping under New Mexico or federal law.  Although Sangiovanni's conduct undoubtedly establishes his commission of a felony other than being a felon in possession of a firearm, the felon-in-possession guideline only cross references to another crime if the cross reference will result in a higher offense level.  See U.S.S.G. § 2K2.1(c)(1)(A).  Here, no other crime will result in an offense level greater than 30, which is the offense level calculated using the un-cross-referenced felon-in-possession guideline.

### A.   A SENTENCING COURT MAY APPLY A CROSS REFERENCE TO A CRIME EVEN IF THE DEFENDANT WAS NOT CONVICTED OF THAT CRIME.

The Court may apply the kidnapping guideline -- or a guideline corresponding to any other crime -- even though the elements of kidnapping were not proven beyond a reasonable doubt to a jury.  Sentencing factors need only to be proven to a jury when they "increase[] the punishment above what is otherwise legally prescribed," Alleyne v. United States, 133 S. Ct. at 2158; otherwise, the sentencing judge may find them by a preponderance of the evidence.  The exact, determinate sentence that a judge selects from within the discretionary range available for the crime of conviction is not "legally prescribed" in the meaning of Alleyne v. United States.  Punishment is legally prescribed only when the legislatively enacted law mandates it by setting a specific sentence or cabining the sentencing judge's discretion to a specified range.  Alleyne v. United States, 133 S. Ct. at 2158.

> In holding that facts that increase mandatory minimum sentences must be submitted to the jury, we take care to note what our holding does not entail.  Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury.  We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment.  See, e.g., Dillon v. United States, 130 S. Ct. 2683, 2692 (2010)("[W]ithin established limits[,] . . . the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts" (emphasis deleted and internal quotation marks omitted)); Apprendi, 530 U.S. at 481 ("[N]othing in this history suggests that it is impermissible for judges to exercise discretion -- taking

into consideration various factors relating both to offense and offender -- in imposing a judgment <u>within the range</u> prescribed by statute").

<u>Alleyne v. United States</u>, 133 S. Ct. at 2163 (alterations in original)(emphasis in original).  The Court does not know how much more clearly the Supreme Court can say it.  The Guidelines are advisory, not mandatory, and, thus, in federal court, the only sentencing factors that must be proven to a jury are those that trigger an increase in the statutory maximum or statutory minimum.  <u>See</u> <u>United States v. Booker</u>, 543 U.S. 220 (2005)(rendering the Guidelines advisory rather than mandatory); <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000)(holding that any fact that increases the statutory maximum sentence must be proven to a jury); <u>Alleyne v. United States</u>, 133 S. Ct. at 2158 (holding that any fact that increases the statutory mandatory minimum must be proven to a jury).  Sangiovanni's crime of conviction carries no statutory minimum and a statutory maximum of ten years, <u>see</u> 18 U.S.C. § 924(a)(2), and the facts that trigger that statutory sentencing range were proven beyond a reasonable doubt at his jury trial; thus, any sentence within a zero-to-ten-year range does not violate Sangiovanni's rights under the Sixth Amendment.

Although it is a recent case, the Tenth Circuit has also issued several opinions in which it been relatively unambiguous in describing <u>Alleyne v. United States</u>' holding: the case overrules <u>Harris v. United States</u>, 536 U.S. 545 (2002), an opinion in which the Supreme Court held that only facts that trigger an increase in the mandatory maximum need be proven to a jury and that facts that trigger an increase in the mandatory minimum can be found by a judge by a preponderance of the evidence; and extends the rule from <u>Apprendi v. New Jersey</u> to mandatory minimums, as well as statutory maximums.  <u>See, e.g.</u>, <u>United States v. Hoon</u>, No. 14-8027, 2014 WL 3906708, at *1 (10th Cir. Aug. 12, 2014)(publication in F.3d forthcoming)("In <u>Alleyne v. United States</u>, the Supreme Court held that any fact that increases a <u>mandatory</u> minimum is an

element that must be decided by the jury."  (emphasis added)); United States v. Reyes-Soto, 556

F. App'x 675, 677 (10th Cir. 2014)(unpublished)("In Alleyne, the Supreme Court held that any

fact that increases the mandatory minimum sentence constitutes an element of the crime that

must be found by a jury beyond a reasonable doubt.").  Cf. United States v. Goodwin, 541 F.

App'x 851, 852 (10th Cir. 2013)(unpublished)(noting that Alleyne v. United States "left in place

the preexisting rule that a judge may . . . find the fact of a prior conviction").  In United States v.

Limon, No. 13-3324, 2014 WL 1876257 (10th Cir. May 12, 2014)(unpublished), the Tenth

Circuit held that Alleyne v. United States did not bar a district judge from finding Guidelines

enhancements by a preponderance of the evidence:

> [T]he sentencing court did not find facts that increased the statutory sentencing
> range so as to violate Limon's Sixth-Amendment rights.  See Alleyne, 133 S. Ct.
> at 2160 (holding that the Sixth Amendment provides defendants with the right to
> have a jury find those "facts that increase the prescribed range of penalties to
> which a criminal defendant is exposed.").  To the contrary, the sentencing court
> imposed a sentence within the prescribed statutory range of ten years to life
> imprisonment, based on the quantity of drugs charged under Count One of the
> superseding indictment -- to which Limon pleaded guilty.  See 21 U.S.C.
> § 841(b)(1)(A)(ii)(II).  "We have long recognized that broad sentencing discretion
> [within established limits], informed by judicial factfinding, does not violate the
> Sixth Amendment."  Alleyne, 133 S. Ct. at 2163.

United States v. Limon, at 2014 WL 1876257, at *2 (emphasis added).  In fact, it appears that no

Circuit has extended the Alleyne v. United States rule to Guidelines enhancements.[10]  Although

not updated to reflect Alleyne v. United States, the Guidelines describe pretty close to this exact

situation:

> A reference may direct that, if the conduct involved another offense[, the]
> guideline for such other offense is to be applied.  Consistent with the provisions
> of 1.3 (Relevant Conduct), such other offense includes conduct that may be a state

---

[10]The Ninth Circuit -- maintaining a rule that it had even before Alleyne v. United States -- requires that cross references be proven by clear and convincing evidence.  See United States v. Staten, 466 F.3d 708, 717-20 (9th Cir. 2006).  See also supra note 7, at 27.

or local offense and conduct that occurred under circumstances that would constitute a federal offense had the conduct taken place within the territorial or maritime jurisdiction of the United States.  Where there is more than one such other offense, the most serious such offense (or group of closely-related offenses in the case of offenses that would be grouped together under § 3D1.2(d)) is to be used.  For example, if a defendant convicted of possession of a firearm by a felon, to which § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition) applies, is found to have possessed that firearm during commission of a series of offenses, the cross reference at § 2K2.1(c) is applied to the offense resulting in the greatest offense level.

U.S.S.G. § 1B1.5 cmt. 3.

Sangiovanni's sole argument hinges on United States v. Lake, a less-than-two-page unpublished opinion.  The Honorable Stephen H. Anderson, Senior United States Circuit Judge for the Tenth Circuit, wrote the opinion, and he was joined by the Honorable John C. Porfilio and the Honorable Wade Brorby, Senior United States Circuit Judges for the Tenth Circuit.  The Court will reproduce the entirety of the relevant language of that case:

The 135-month sentence Mr. Lake received was based, in part, on the assessment of a base offense level of thirty-eight under the [Guidelines], because, pursuant to U.S.S.G. § 2D1.1(a)(2), death had resulted from the use of the controlled substance.

Mr. Lake appealed his sentence, arguing that the district court had erred by denying his objection to the application of the "death enhancement" under U.S.S.G. § 2D1.1 and had further erred in refusing to grant his request for a downward variance from the advisory Guidelines range of 135-168 months. Following the filing of Mr. Lake's initial appellate brief, the United States Supreme Court issued its decision in Alleyne v. United States. The Court in Alleyne held that any finding of fact which increases the legally allowed range of possible punishment "constitutes an element of a separate, aggravated offense that must be found by the jury." Alleyne v. United States, 133 S. Ct. at 2162.

The government has conceded that Alleyne applies to Mr. Lake's sentencing proceeding: "Similar to the 'brandishing' finding which increased the possible sentence in Alleyne, the district court here made a finding that the conspiracy to distribute heroin resulted in the death of an unindicted co-conspirator. The 'resulted in death' finding aggravated the range of punishment." Appellee's Br. at 2.  That judicial finding violates the Sixth Amendment and requires a remand for a new sentencing hearing.

Accordingly, we remand this case for new sentencing proceedings, in accordance with Alleyne.

REVERSED and REMANDED.

United States v. Lake, 530 F. App'x at 832 (citations omitted).

First, the Court must keep in mind that, after the Supreme Court's holding in Alleyne v. United States, the Tenth Circuit received many habeas petitions and appeals seeking to profit from the new constitutional rule. See United States v. Hoon, 2014 WL 3906708, at *1-2 (holding that Alleyne v. United States announces a new constitutional rule, but that it may not be applied retroactively on collateral review). Almost every Tenth Circuit opinion citing Alleyne v. United States has been only a few pages long, unpublished, or both. This scenario does not make for the best quality control in judicial opinions, and the Court believes that the Tenth Circuit elected not to publish United States v. Lake for a reason.

Second, the United States conceded away the central issue -- the applicability of Alleyne v. United States to Guidelines enhancements -- in United States v. Lake, and the Tenth Circuit, without conducting its own analysis, went along with it. Without delving into the nuances of appellate procedural rules or confession of error, the Court notes that, generally, when the United States wants to concede an issue in favor of a criminal defendant, the Court will go along with it. This rule of thumb sits at the intersection of two general jurisprudential concepts: prosecutorial discretion -- meaning that the United States can drop charges altogether if it wishes; and mutual consent -- a concept applicable to both criminal and civil cases, which provides that courts can do things that they otherwise would not do, when all parties consent to the court doing them.

Third, there is strong evidence that the United States' concession in United States v. Lake was erroneous. The United States' representative in this case certainly seems to think so. See

Oct. 18, 2013 Tr. at 47:3-13 (Cairns)("The Government conceded the issue stupidly.  Stupidly.

If I sound angry about that, I am.  I can't imagine who made that decision, but the Government

conceded the issue.").  Even more importantly, the United States' representative in United States

v. Lake has come to his or her senses, and also wants to take back the concession.  After the

Court held both of its hearings in this case, United States v. Lake went back up on appeal, and

the United States sang a different tune regarding Alleyne v. United States:

> The government in this appeal argues that its confession of error in the appeal of
> Ramon Lake was itself erroneous.  Shortly before the United States filed its brief
> in the appeal of Ramon Lake, the Supreme Court had announced its decision in
> Alleyne v. United States.  That case held that it was an infringement of Sixth
> Amendment rights for a defendant to be subjected to a higher, statutory minimum
> sentence than would otherwise have been applicable if the basis for the increase
> was not subject to a jury finding under the beyond a reasonable doubt standard.
>
>         In the appeal of Ramon Lake, the government conceded that Alleyne
> applied not just to findings which increased the statutory minimum sentence, but
> also to findings that increased a defendant's advisory guidelines sentencing range.
> The government's current position, as we understand it, is that Alleyne is limited
> to mandatory minimum sentences prescribed by statute and does not apply to
> cases like the present case, nor should it have applied to that of Ramon Lake.

United States v. Lake, 556 F. App'x 706, 708 (10th Cir. 2014)(Holloway, J.)(unpublished).  The

Tenth Circuit did not reach the issue of interpreting Alleyne v. United States -- it decided that

allowing Lake to be resentenced did not work a manifest injustice -- but nor did it voice the

slightest vote of confidence in the legal rule that the first United States v. Lake (possibly,

weakly) articulated.

    The Court will thus not follow United States v. Lake, 530 F. App'x 831, and will rely

instead on other Supreme Court and Tenth Circuit case law.  While the Court could not disregard

a published Tenth Circuit opinion, it is also reluctant to not follow an unpublished Tenth Circuit

opinion, and, to its memory, never has.  This one, however, does not appear to have "persuasive

value with respect to a material issue in [this] case[, nor] would [it] assist the court in its

disposition." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  Indeed, the Court

concludes that it could not follow United States v. Lake without disregarding other Supreme

Court and Tenth Circuit precedent.[11]  So it is with full respect and deference, not insolence, that

the Court declines to follow the case.

When stripped of that one outlier, the body of case law is consistent: only sentencing

factors that increase the mandatory minimum or maximum sentence need to be proven to a jury.

When the jury delivered a guilty verdict against Sangiovanni for being a felon in possession of a

firearm, the Court was constitutionally empowered to impose any sentence above the statutory

minimum -- which here is zero incarceration -- and below the statutory maximum of 120 months.

---

[11]In the U.S. Memo., and at the second hearing on this case, the United States presented an alternative argument to its primary contention that United States v. Lake was wrongly decided.  It argues that United States v. Lake is distinguishable, because the guideline in that case directs the sentencing court to apply the enhancement if "the offense of conviction establishes that death or serious bodily injury resulted."  U.S.S.G. § 2D1.1(a)(2).  Thus, the United States argues, the district court in United States v. Lake improperly looked at the defendant's relevant conduct when it should have looked only at the bare elements of the offense of conviction.  See U.S. Memo. at 4-5.

The district court in United States v. Lake may have misread the guideline when it applied § 2D1.1(a)(2) when the offense of conviction, 21 U.S.C. § 846, does not necessarily entail death or serious bodily injury.  That being said, this error amounts to a mechanical misapplication of the Guidelines; it is not constitutional in nature, as United States v. Lake concludes it is.  After all, if the district court were so inclined, it could have declined to apply § 2D1.1(a)(2), but then varied upwards at the end of the Guidelines calculations to reach the same result that would have been reached had the court applied the enhancement.  A logical consequence of United States v. Booker is that, when the Guidelines direct that an enhancement be applied only if the crime of conviction establishes it, that directive can be ignored by the sentencing court, which is empowered to use all relevant conduct in imposing a sentence within the statutory bounds.

The Court thus rejects the United States' proposed distinction, because the district court in United States v. Lake imposed a constitutionally valid sentence, even if it did misapply a guideline -- a guideline that, like all guidelines, is advisory in any event.  The Court suspects that the United States does not put much stock into the distinction it offers, but rather is trying to give the Court a fig leaf to hide behind to avoid directly contradicting a Tenth Circuit case.  The United States' other representations -- both in the first hearing on this case and in the subsequent appeal of United States v. Lake -- belie its belief in the distinction.

If additional statutes, Guidelines, policy statements, etc., mandatorily restricted the Court's discretion to sentence anywhere within that range upon a certain factual finding, then that finding would have to be proven to a jury.  See United States v. Booker, 543 U.S. at 226-44 (holding that where Guidelines enhancements -- or any other enhancement -- must mandatorily be applied by the sentencing judge, the facts triggering the enhancement must be proven beyond a reasonable doubt to a jury).  No such restriction has existed, however, since United States v. Booker rendered the Guidelines advisory.  As the Court is not considering sentencing Sangiovanni to a sentence above 120 months, the Court may rely on any facts it deems relevant -- whether in the Guidelines or not -- to select Sangiovanni's sentence within the zero-to-ten year range.

**B.      NO CROSS REFERENCE APPLIES: SANGIOVANNI'S CONDUCT DOES NOT SATISFY THE ELEMENTS OF KIDNAPPING, AND NO OTHER POTENTIAL CROSS REFERENCE RESULTS IN A HIGH ENOUGH OFFENSE LEVEL TO ACTIVATE THE CROSS-REFERENCE PROVISION.**

The Court will not cross reference to the kidnapping guideline, because Sangiovanni did not commit kidnapping.  Sangiovanni's relevant conduct occurred entirely in New Mexico, and he was thus subject to the jurisdiction of only two sovereigns: the United States and the State of New Mexico.  See, e.g., Edgar v. MITE Corp., 457 U.S. 624, 642-43 (1982)(recognizing constitutional limits on the extraterritoriality of state law).  Sangiovanni did not violate the federal kidnapping statute -- or, perhaps more accurately, he was not subject to its jurisdiction -- because he neither crossed state lines with Shelby V. nor was he subject to any of the special jurisdictions of the United States.  See 18 U.S.C. § 1201(a).  Thus, if the kidnapping guideline is to apply, the Court must find by a preponderance of the evidence that Sangiovanni violated the New Mexico kidnapping statute, which provides as follows:

A.      Kidnapping is the unlawful taking, restraining, transporting or confining of a person, by force, intimidation or deception, with intent:

- 46 -

(1)     that the victim be held for ransom;

(2)     that the victim be held as a hostage or shield and confined against his will;

(3)     that the victim be held to service against the victim's will; or

(4)     to inflict death, physical injury or a sexual offense on the victim.

B.     Whoever commits kidnapping is guilty of a first degree felony, except that he is guilty of a second degree felony when he voluntarily frees the victim in a safe place and does not inflict physical injury or a sexual offense upon the victim.

N.M. Stat. Ann. § 30-4-1.

Although the four subparts (1) through (4) are disjunctive -- they are categories, rather than prongs, as Sangiovanni's conduct needs to satisfy only one of them -- none of them apply to this case.  Sangiovanni did not hold Shelby V. "for ransom," so he did not commit category (1) of kidnapping.  N.M. Stat. Ann. § 30-4-1A(1).  See Black's Law Dictionary 1374 (9th ed. 2009)(defining "ransom" as "[m]oney or other consideration demanded or paid for the release of a captured person").

Sangiovanni also did not commit a category (2) kidnapping.   He neither used Shelby V. as a shield nor did he hold her as a "hostage."   N.M. Stat. Ann. § 30-4-1A(2).   "[T]he term hostage, . . . in the context in which it is used in [New Mexico's] kidnapping statute, implies the unlawful taking, restraining or confining of a person with the intent that the person, or victim, be held as security for the performance, or forbearance, of some act by a third person."  State v. Crump, 1971-NMSC-051, ¶ 25, 82 N.M. 487, 492-93, 484 P.2d 329, 334-35 (emphasis added). See State v. Davis, 1979-NMCA-015, ¶ 20, 92 N.M. 563, 569, 591 P.2d 1160, 1166 ("The issue . . . is whether Tessier could be the third person involved in Judy, Kristin and Jennifer being held

as hostages. . . .  [T]he victim and the third person cannot be the same individual; thus, Tessier could not have been a hostage . . . .").

Sangiovanni did not commit a category (3) kidnapping, because Shelby V. was not "held to service."  N.M. Stat. Ann. § 30-4-1A(3).  This category requires that "the victim be held against his or her will to perform some act, or to forego performance of some act, for the benefit of someone or something."  State v. Kersey, 1995-NMSC-054, ¶ 12, 120 N.M. 517, 520, 903 P.2d 828, 831 (quoting State v. Vernon, 1993-NMSC-070, ¶ 13, 116 N.M. 737, 740-41, 867 P.2d 407, 410-11)(internal quotation marks omitted).  Sangiovanni did not hold Shelby V. to do anything; he wanted to talk to her.  See PSR ¶¶ 6-8, at 4-5.  Moreover, any service the alleged kidnapper forces the victim to perform must be central -- not merely incidental -- to the purpose of the alleged kidnapping.  See State v. Rojo, 1999-NMSC-001, ¶ 34, 126 N.M. 438, 448, 971 P.2d 829, 839 ("When robbery is used to satisfy the 'held to service' requirement for kidnapping, the State must show that robbery was the goal of the kidnapping."  (citation omitted)); State v. Baca, 1995-NMSC-045, ¶ 41, 120 N.M. 383, 393, 902 P.2d 65, 75 (holding that, to satisfy the "held for service" requirement, "the victim [must] confer . . . independent assistance or benefit to the perpetrator of the crime," and stating that "incidental movement of a victim to a remote location" does not satisfy the requirement).  For this reason, Sangiovanni's various incidental directions to Shelby V., including that she get him a Coke, do not satisfy the "held to service" requirement.

Last, Sangiovanni did not commit a category (5) kidnapping, because he did not intend to "inflict death, physical injury or a sexual offense" upon Shelby V.; the Court will address the death and physical injury components first.  There is some suggestion that the gun Sangiovanni used was unloaded during the incident.  Even if it was not, however, the Court concludes that a

preponderance of the evidence indicates that Sangiovanni did not intend to kill or physically harm Shelby V.; it would have been easy for him to do so, or to take Shelby V. to a remote location to do so -- the pair were in a car throughout the incident.  Accordingly, the Court does not believe that Sangiovanni intended to physically harm her.  Furthermore, that the encounter ended on Sangiovanni's terms, i.e., that he terminated the encounter, rather than her escaping from him, is evidence that he did not intend any such harm.  See PSR ¶ 8, at 5.  It appears, from the record before the Court, that he intended to scare and intimidate her but not to physically harm her.  The United States argues that Sangiovanni perpetrated a "sexual offense" on Shelby V. when he forced her to kiss him at the conclusion of the encounter, see Oct. 18, 2013 Tr. at 8:8-13 (Cairns), because this kiss constitutes a battery, and this particular battery is "sexual" in nature, Oct. 18, 2013 Tr. at 15:10-20 (Cairns).  The Court agrees that the unwanted kiss constitutes a battery, but the problem with the United States' argument is that "sexual offense" is a term of art in New Mexico criminal law.  Article 9 of the criminal code is entitled "Sexual Offenses" and contains a list of offenses the Court concludes exclusively comprises the umbrella category of "sexual offenses" for the purposes of the kidnapping statute.  The Court has examined each section of Article 9, and none of the crimes therein cover Sangiovanni's conduct. The closest are: (i) "[e]nticement of [a] child," N.M. Stat. Ann. § 30-9-1, which does not apply, because there is no evidence that Sangiovanni ever actively attempted to entice or persuade Shelby V. to commit any other sexual offense -- for example, having sex with him -- while he was restraining her; and (ii) "[c]riminal sexual contact," N.M. Stat. Ann. § 30-9-12, and "[c]riminal sexual contact of a minor," N.M. Stat. Ann. § 30-9-13, both of which are inapplicable, because each requires contact with "the intimate parts" of the victim, defined as

"the primary genital area, groin, buttocks, anus or breast."  Forcing a kiss does not satisfy the elements of any sexual offense in the New Mexico criminal code.

Sangiovanni's conduct may trigger cross references to provisions other than kidnapping, but none of them result in an offense level that is greater than 30 -- the offense level to which Sangiovanni is subject under the un-cross-referenced felon-in-possession guideline -- and thus none of them apply.  See U.S.S.G. § 2K2.1(c)(1)(A) (directing the sentencing judge to apply a cross reference "if the resulting offense level is greater than that determined above").  Sangiovanni's conduct satisfies the elements of aggravated assault, see N.M. Stat. Ann. § 30-3-2A ("Aggravated assault consists of . . . unlawfully assaulting . . .  another with a deadly weapon . . . ."); § 30-3-1B ("Assault consists of . . . any unlawful act, threat, or menacing conduct which causes another person to reasonably believe that he is in danger of receiving an immediate battery . . . ."); § 30-1-12B (defining "deadly weapon" to include "any firearm, whether loaded or unloaded"), but the Guidelines would indicate an offense level of 20 if that cross reference were applied, see U.S.S.G. § 2A2.2 (providing a base offense level of 14 and a four-point enhancement for use of a dangerous weapon, see § 2A2.2(b)(B), which would then be enhanced by the two-point obstruction-of-justice adjustment, see U.S.S.G. § 3C1.1).

The Court will therefore apply the felon-in-possession guideline without cross reference, beginning with a base offense level of 24, which reflects that Sangiovanni has been convicted of two prior felonies either of violence or of a controlled substance violation.  See U.S.S.G. § 2K2.1(a)(2).  The Court will then add a 4-level enhancement for "us[ing] or possess[ing the] firearm . . . in connection with another felony offense," the other felony being the aggravated assault described above.  U.S.S.G. § 2K2.1(b)(6)(B).  See N.M. Stat. Ann. § 30-3-2 ("Whoever commits aggravated assault is guilty of a fourth degree felony.").  Last, the Court will apply the

2-level enhancement for obstruction of justice.  See U.S.S.G. § 3C1.1; PSR ¶ 39, at 9-10.  When

matched against Sangiovanni's uncontested criminal history category of VI, this 30-point offense

level indicates a final Guidelines-calculated sentencing range of 168-210 months.  See U.S.S.G.

§ 5A.

## II.    THE COURT WILL NOT GRANT SANGIOVANNI'S REQUEST FOR A VARIANCE AND WILL SENTENCE HIM TO THE STATUTORY MAXIMUM OF 120 MONTHS.

At 168-210 months, Sangiovanni's Guidelines-suggested sentencing range is far enough

above the statutory maximum for the Court to be cautious of imposing a sentence below the

maximum.  Of course, the Court is free to impose a sentence at odds with the Guidelines'

recommendation, and Sangiovanni's upbringing and mental health history are indeed striking.[12]

If the Guidelines-calculated range had ended up being 120-150 months, as Sangiovanni posited it

would be if the cross reference to the kidnapping guideline were not applied, then the Court

---

[12]This factor puts downward pressure on the sentence.  There are, however, factors that place upward pressure on Sangiovanni's sentence, most notably 18 U.S.C. § 3553(a)(2)(B)'s command that the district judge impose a sentence that "affords adequate deterrence to criminal conduct."  Deterrence is evaluated both on a specific level -- the extent to which a sentence will deter that defendant from future criminal conduct -- and on a general level -- the extent to which a sentence will deter citizens, generally, from committing the crime of which the instant defendant is being sentenced.  The Court concludes that the Guidelines accurately reflect the considerations of general deterrence in this case, but that any downward variance would likely underestimate the need to specifically deter Sangiovanni from future criminality.  Sangiovanni committed this offense within a year of his release from a nine-year prison term.  See PSR ¶ 6, at 4 (noting that the offense of conviction occurred on April 25, 2010); id. ¶¶ 46-49, at 11-13 (noting that Sangiovanni was in prison from December 15, 1999, until June 14, 2009).  This quick turnaround suggests that there is a special need to specifically deter Sangiovanni from further criminal conduct.  It also indicates that there is a special need to protect the public from Sangiovanni.  See 18 U.S.C. § 3553(a)(2)(C).

Ultimately, the Guidelines-suggested sentence is too far above the statutory maximum for the Court to feel comfortable varying below the statutory maximum -- absent extraordinary circumstances not present here.  The Court points out the existence of upward-pressing factors, however, to make the point that, even if the bottom of the Guidelines range coincided with the statutory maximum -- as Sangiovanni contends a properly calculated range would -- Sangiovanni would not deserve a downward variance.

might be tempted to vary his sentence down into the statutory range.  See Sangiovanni Memo. ¶ 6, at 4 (calculating the felon-in-possession guideline without taking into account the 4-level enhancement for possessing the firearm in connection with another felony).  As it stands, however, the lowest Guidelines sentence is forty percent higher than the statutory maximum.

The Guidelines are designed to punish on the basis of the defendant's "real offense" -- the actual conduct in which the defendant engaged -- rather than on his "charge offense" -- the statutory provision under which the defendant is convicted.  U.S.S.G. § 1A1.4(a).  Real offense sentencing is less manipulable by the prosecution's charging tactics; less dependent upon prescient and precisely drafted statutes taking into account every possible mitigating and aggravating factor in advance; and suited to crafting sentences that are appropriate for the specific offender to which they are to be applied.  Section 3553(a) is the quintessential real offense sentencing statute, directing courts to take into account the needs of each situation, and outlining factors generally applicable to every crime of conviction.  See 18 U.S.C. § 3553(a).  To the extent that there is some remnant of charge offense sentencing in the United States Code, it is found in the statutory maximums and minimums applicable to each crime of conviction.  Thus, for the purposes of granting variances below the statutory maximum, the Court does not treat a Guidelines sentencing range one month above the statutory maximum as functionally identical to a range five years above the statutory maximum.  In such instances, the Guidelines likely indicate the defendant's earned sentence more than the statutory maximum, and while, of course, the Court may not impose a sentence above the maximum, it will be much more cautious about going beneath it when the Guidelines vastly outstrips the statute.  At a minimum, the bottom of the pre-5G1.1 Guidelines range -- not the statutory maximum and post-5G1.1 Guidelines sentence -- produces a good starting point to start the variance process.  In short, when a

defendant's Guidelines sentencing range greatly exceeds his statutory maximum, more often than not, it indicates that the defendant got off easy, not that the Guidelines are out of control.

The virtues of charge offense sentencing are increased legislative control and greater consistency -- both among different judges and among similarly situated defendants. The first consideration is controlled by Congress, who can narrow or widen statutory sentencing ranges as it pleases, and whose prerogative it is to strike the balance between global sentencing policy and judicially customized sentencing. As long as courts respect the boundaries that Congress has put in place, i.e., as long as they sentence inside the statutory ranges,[13] this consideration is respected; Congress cannot be made to exert additional control if it wants to hand over that control to judges. Congress commissioned the Guidelines in service of the second consideration. See United States v. Nolf, No. 10-1919-002 JB, 2014 WL 3377695, at *23-24 (D.N.M. June 20, 2014)(Browning, J.) . The more the Court varies from the Guidelines range, the less consistent the resultant sentence will be in relation to what other judges are doing. While it may be true that other judges would grant the same variances that the Court would in the face of exceptional facts, only speculation supports such an assumption. The Guidelines, on the other hand, represent the codification of the best evidence available on sentencing practices. The Court can, and should, vary from the Guidelines if uniformity would be unwarranted -- i.e., if the defendant deserves to be treated differently than other defendants with similar Guidelines-countenanced features, and uniform treatment would be artificial -- but that means varying only for cases truly outside of the ordinary and not merely varying out of sympathy for the defendant.

---

[13]There are situations -- that Congress designed -- in which courts may impose sentences outside of the statutory sentencing range, most notably the "safety valve" and the reduction for providing substantial assistance to the United States. 18 U.S.C. § 3553(e), (f). None of these apply to this case, nor does their application impinge upon the legislative branch's supremacy in specifying sentences.

Sangiovanni was dealt a losing hand in life: bad parents, abusive upbringing, mental illness.  He compounded these problems with poor choices, as anyone might: dropping out of school, drug abuse, criminal activity.  From the start, Sangiovanni has had worse luck than most, and had he been given better opportunities, no one knows what might have happened with his life.  The Court cannot say, however, that Sangiovanni's circumstances -- both those made from luck and from choice -- are drastically out of the ordinary among people facing a 164-210 month Guidelines sentence.  The sad fact is that most defendants with a criminal history category of VI, prior sex offenses, and a Guidelines range above the maximum did not end up where they are purely as a result of an evil constitution and deliberately squandered potential.  It is with no lack of empathy that the Court denies Sangiovanni's request for a variance, but whatever personal factors mitigate Sangiovanni's commission of this offense are outweighed by the seriousness of his crime.  In the end, the Court must protect the public from Sangiovanni, and that § 3553(a) factor dominates the calculus.

**IT IS ORDERED** that Defendant Christian A. Sangiovanni's objection to the Presentence Investigation Report contained in Mr. Sangiovanni's Sentencing Memorandum, filed August 14, 2013 (Doc. 85), is sustained, and his request for a downward variance is denied. The Court will sentence Sangiovanni to 120-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Adam S. Rowley
Norman Cairns
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Marc H. Robert
  Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

*Attorneys for the Defendant*